UNITED STATES of America,

v.

**Marilyn BUCK, Defendant.**

**UNITED STATES of America**

v.

**Mutulu SHAKUR, Defendant.**

**Nos. 84 Cr. 220–CSH, SSS 82 Cr. 312–CSH.**

United States District Court, S.D. New York.

July 6, 1988.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for U.S.; Abraham D. Sofaer, Legal Advisor, Dept. of State, Michael J. Matheson, Deputy Legal Advisor, Dept. of State, Edward R. Cummings, Asst. Legal Advisor for Politico–Military Affairs, Dept. of State, W. Hays Parks, Chief, Intern. Law Branch, Office of the Judge Advocate General, Dept. of the Army.

Albert H. Dyson, Office of the General Counsel, Dept. of Defense, Chokwe Lumumba, Chairman, New Afrikan Peoples Organization, Brooklyn, N.Y., Nkechi Taifa–Caldwell, Minister of Justice, Republic of New Afrika, Washington, D.C., for Dr. Mutulu Shakur.

Lennox S. Hinds, Stevens, Hinds, & White, P.C., New York City, Permanent Representative to the United Nations for the Inter. Ass'n of Democratic Lawyers, for amicus curiae.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Defendant Mutulu Shakur moves to dismiss indictment SSS 82 Cr. 312 (CSH). He contends that the acts charged in the indictment are political acts which are not properly the subject of criminal prosecution. He further contends that under applicable treaties and international law he is a prisoner of war, and thus immune from prosecution for the acts charged in the indictment. Defendant Marilyn Buck joins the motion "as it applies to the conspiracy [charged in indictment 84 Cr. 220 (CSH)] and as it applies to, in particular, the breakout of Joanne Chesimard, also known as Assata Shakur." Trial Tr. at 10,178, March 22, 1988.

### I.

When he was arraigned on the indictment in 1985, Shakur appealed orally to the "Geneva Conventions" and a "prisoner of war" status.

Thereafter, and on several occasions, Shakur's counsel stated an intention to move to dismiss the indictment under international law.

Counsel and Court busied themselves with various other motions, including motions to suppress evidence, bail applications, the proper structuring of the trial, and related matters.[1]

On November 2, 1987, just before jury selection began, counsel for Shakur filed and served an affidavit and a memorandum of law in support of the present motion. The Court heard oral argument on Novem-

---

1. *See e.g. United States v. Buck,* 813 F.2d 588 (2d Cir.1987) (reversing lower court's suppression of evidence); *United States v. Shakur,* 817 F.2d 189 (2d Cir.1987) (reversing lower court's admission of defendant to bail).

ber 25, 1987. On November 26 Shakur submitted a further written exposition of his position on certain questions raised at the oral argument.

The office of the United States Attorney for this district characterized Shakur's motion as frivolous, submitted no brief in opposition, and stood mute at oral argument, although expressing a willingness to respond to any questions the Court might have.

Having considered the submissions on behalf of Shakur, I issued a Memorandum Opinion and Order dated January 19, 1988 directing the United States Attorney to respond to certain questions.[2]

Upon receipt of that order, the United States Attorney's office forwarded it, together with Shakur's motion papers and the indictment, to the United States Department of State to seek the assistance of that agency in preparing a response.

The Department of State responded to Shakur's motion by recruiting a team of five attorneys from the Departments of State, the Army, and Defense, headed by Abraham D. Sofaer, the Legal Advisor to the Department of State. That team, taking advantage of a number of extensions of time the Court granted at the request of the United States Attorney, prepared a 36-page memorandum of authorities opposing the motion which the United States Attorney submitted as an exhibit to an affidavit dated March 23, 1988.

Shakur has served reply papers. Counsel for Buck have filed no affidavits or briefs.

For reasons stated below, I concluded that these motions presented no fact issues for jury determination. Accordingly I de-nied from the bench defendants' alternative request for jury instructions in these general areas. On May 11, 1988 the jury convicted both defendants on all counts. Sentencing is pending. This opinion addresses the merits of defendants' motions.

## II.

Defendants' motions rest on their perception of the political situation faced by Americans of African ancestry and of the role of the Republic of New Afrika ("RNA") in responding to that situation. In brief, defendants view the RNA as a sovereign nation engaged in a war of liberation against the colonial forces of the United States government. The Fifth Circuit summarized that premise in a case involving a member of the Provisional Government of the Republic of New Afrika:

> The RNA claims that it is an independent foreign nation composed of "citizens" descended from Africans who were at one time slaves in this country. It contends that the African slaves in America were converted into a free community by, successively, the Confiscation Acts of 1861 and 1862, the Emancipation Proclamation of January 1863, and the Thirteenth Amendment to the Constitution of the United States. It further insists that the citizenship of the slaves, upon being freed, reverted to that of their ancestors at the time they were brought to America. That means to the RNA that they resumed African citizenship and owed no allegiance to this country. The RNA contends that it, and not the United States, is sovereign over Mississippi, Louisiana, Alabama, Georgia, and South

---

2. The five questions I asked the government to address were:
 1. What role, if any, did the United States play in the development of the 1977 protocols proposed as amendments to the 1949 Geneva Prisoner of War Convention?
 2. What is the history and present status of the United States' position with respect to the 1977 protocols?
 3. Do the 1977 protocols reflect the current state of international law on the issue of when prisoner-of-war treatment must be accorded to accused persons?

4. Assuming that the United States has not adopted the 1977 protocols, but that the protocols do reflect current international law, is this Court required or permitted to decline to analyze the present motion under the principles enunciated therein? Cf. *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980).
 5. Analyzed under the principles enunciated in the 1977 protocols, should the criminal enterprise charged in the indictment be regarded as an insurgency?

Carolina, because those are lands 'upon which the Africans had lived in the majority traditionally and which they had worked and developed.' It says that it has asserted sovereignty over those lands ever since 'the blacks occupying it took up arms against the authority of the United States and thus asserted their New African nation's claim to the land, and, briefly, to independence' when President Andrew Johnson issued proclamations in 1865–1866 giving that land back to its former owners. The RNA says that its sovereignty over the lands in the five named states has never ceased, and that the United States has merely operated there without right or authority. It claims that its efforts to regain that land have intensified since the 'formal revival and organization' of the New African Government by proclamation on March 31, 1968.

*United States v. James*, 528 F.2d 999, 1005 (5th Cir.1976), *rehearing denied* 532 F.2d 1054, *cert. denied* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976).[3]

In support of their view of the sovereign status of the RNA, defendants have submitted an affidavit of counsel detailing some of the history of African peoples in North America, with particular emphasis on incidents of resistance to slavery and incidents of former slaves establishing self-governing communities throughout the southeastern United States. Defendants conclude from this history that people of African descent are and have been engaged in a struggle to assert their right to self determination. They see local, state and federal law enforcement agencies as their opponents in the struggle.

## III.

■ Defendants argue that they are entitled to immunity from prosecution from the acts charged in the indictment because those acts are "political" in nature. They describe the indictment in these terms:

> [Defendants are] accused of membership in an underground New Afrikan guerilla formation, called the "Family," or the Revolutionary Armed Task Force, which is apparently a unit of the Black Liberation Army. The Army unit involved has adopted armed struggle as a method to fight for the freedom of New Afrikans, and for the independence of New Afrika. The acts alleged arise from this Army unit's attacks on federally insured banks. These actions were designed to raise money for the New Afrikan Independence Movement, and complimentary [sic] objectives. The acts alleged also involve a military engagement designed to liberate a soldier of the Black Liberation Army, Assata Shakur.

Memorandum in Support at 40. Citing several cases which construe the political offense exception to extradition treaties, defendants argue by analogy that the offenses charged in the present indictments are political and are thus not properly subject to criminal prosecution. *See Quinn v. Robinson*, 783 F.2d 776 (9th Cir.1986); *Eain v. Wilkes*, 641 F.2d 504 (7th Cir.1981); *In re Doherty*, 599 F.Supp. 270 (S.D.N.Y. 1984).

To the extent defendants contend that politically motivated acts are immune from

---

3. The defendant in *James* was asserting diplomatic immunity to the charges filed against him, not challenging the Court's jurisdiction based on the character of the acts charged, nor on a claim of immunity based on prisoner of war status. Diplomatic immunity for members of the Provisional Government of the Republic of New Africa has also been rejected by the Second Circuit. *United States v. Lumumba*, 741 F.2d 12, 14 (2d Cir.1984). While the Second Circuit has been presented with the question whether defendants charged in one of the indictments at bar (84 Cr. 312) are entitled to prisoner of war status, it has not discussed the question. *United States v. Ferguson*, 758 F.2d 843, 846 n. 1 (2d Cir.1985). Apparently, the Court of Appeals rejected the prisoner of war argument for the same reasons it rejected the assertion of diplomatic immunity, as the only case cited for *Ferguson*'s rejection of prisoner of war status was *United States v. Lumumba, supra*. With due respect, I think it fair to note that in challenging the jurisdiction of this Court by claiming immunity arising from prisoner of war status, the defendants rely on distinct legal theories which raise issues not present in a claim of diplomatic immunity. I therefore do not view the Court of Appeals' rejection of the claim in *Ferguson* as necessarily dispositive of the present motions.

criminal prosecution, the cited cases provide them no direct support. The political offense exception to extradition treaties has a long and interesting history, *see Quinn v. Robinson, supra,* 783 F.2d at 792–803, and may arguably be applied to bar the extradition of people accused of politically motivated acts of violence, even when the victims of the politically motivated violence are innocent civilians. *Quinn,* at 802 n. 27. *But see Eain v. Wilkes, supra,* 641 F.2d at 520 (acts must be aimed at disruption of political structure, not social structure, to qualify for political offense exception). Nevertheless, no authority has yet held that politically motivated acts of violence are immune from criminal prosecution in the jurisdiction where they occurred.

In the case at bar, defendants seek to extend the political offense exception derived from extradition treaties to politically inspired acts of violence occurring within the jurisdiction of the prosecuting authority. Their argument is, in essence, an appeal to the independence of the judicial branch of government. Just as the independent extradition magistrate in *Doherty* frustrated the desire of the executive branch to extradite Doherty to the United Kingdom, so too, defendants argue, an independent trial judge should frustrate the government's desire to prosecute individuals for politically motivated domestic crimes.

I conclude that the analogy is false; and that so far-reaching an extension of the "political offense" concept is unwarranted.

First, it is important to note that extradition law has its own peculiar characteristics, which militate generally against transposition into other areas. Judge Friendly had occasion to stress that factor in *United States v. Doherty,* 786 F.2d 491 (2d Cir. 1986), a further ramification of the *Doherty* case in the District Court cited *supra.* In that case, Judge Sprizzo sitting as extradition magistrate refused to extradite Doherty to the United Kingdom, relying upon the political offense exception in the then-existing treaty between the United Kingdom and the United States. Because under settled case law the government could not appeal directly from the extradition magistrate's refusal of the writ, the government in *Doherty* instituted a new action for declaratory judgment. This Court dismissed that action for failure to state a claim upon which relief could be granted, 615 F.Supp 755 (S.D.N.Y. 1985); Judge Friendly's opinion rejected the government's appeal from that decision. In concluding that the Declaratory Judgment Act ("DJA") did not apply to extradition proceedings, Judge Friendly quoted with approval an argument made by the government in another case:

> "In a brief filed only a week before the present case was argued, the Government urged in support of an extradition request before a magistrate in the Eastern District of Virginia that '[i]nternational extradition proceedings conducted pursuant to Title 18, United States Code, Section 3181, *et. seq.* and the applicable Treaty ... are *sui generis,* and are controlled by a self-contained body of law. The uniqueness of the body of law dealing with international extradition cannot be overemphasized." Government's Brief at 2, *In re Gordon,* Magistrate's Docket No. 85–46–S (E.D.Va. Nov. 27, 1985)[9]. So it was when the DJA was adopted and so, we think, Congress would have desired it to remain thereafter unless and until Congress spoke directly to the point." 786 F.2d at 498.

In footnote 9 dropped from the text at that point, Judge Friendly observed: "The proposition that extradition proceedings are *sui generis* finds ample support in the case law." (Citing cases).

Second, the general characterization of extradition proceedings as *sui generis,* controlled by a "self-contained body of law", proceeds in my view from the particular circumstance that extradition law derives from treaties entered into by sovereign nations. Independent the extradition magistrate may be; but he has his independent office to perform only after two nations have entered into a treaty through diplomatic means, whose terms are then implemented by the nations' respective legislative branches.

By definition, the existence of an international extradition treaty is essential before the extradition magistrate, for all his independence, can be in a position to apply the treaty's terms to a particular fact situation. But the present defendants, seeking to extend to domestic crimes the concept of political offenses derived from extradition law, can point to no analogous sovereign declaration. In short, the independent trial judge defendants envision lacks the necessary jurisprudential stage upon which to play his part. Private individuals are simply not in a position to extend to their own private acts a concept of immunity which derives from treaties among nations. While I have said at footnote 3, *supra*, that the Second Circuit's diplomatic immunity ruling in *United States v. Lumumba, supra*, is not necessarily dispositive of the present motions, Judge Cardamone's analysis is nonetheless instructive:

> "...neither Lumumba nor anyone else is able unilaterally to assert diplomatic immunity. Such status only exists when there is recognition of another state's sovereignty by the Department of State. In other words, recognition by the executive branch—not to be second guessed by the judiciary—is essential to establishing diplomatic status." 741 F.2d at 15.

Third, I conclude that an extension of the political offense exception derived from extradition law—an inherently doubtful extension, for the reasons given—cannot be permitted to repeal or nullify penal codes, federal or state, which proscribe domestic crimes, that is to say, acts made criminal by Congress or the state legislatures and committed within the territorial boundaries of those legislative bodies. To hold otherwise would be unacceptably disruptive of the rule of law.

Accordingly I hold that defendants' political motivations are irrelevant to their liability for prosecution for the crimes charged in the indictments. To the extent the defendants' motion to dismiss the indictments is based upon their characterization of the offenses charged as political, the motion is denied.[4]

### IV.

Defendants also contend they are entitled, under international law including treaties of the United States, to treatment as prisoners of war.

Defendants' argument begins with the assertion that the New Afrikan Nation, which as noted under Point II they define as all people of African ancestry living in the United States, shares with all other peoples of the world the right to self-determination. They contend that:

> As is the case with every colonial experience, the New Afrikan Nation as a colony has no independent economic structure. The vast majority of the population of New Afrika, however, has at all points in history been contained within the same imperialist economic structure, and has shared the misfortune of suffering discriminatory treatment within it. Indeed it is appropriate to say in the case of New Afrika, as in the case of most colonies, that New Afrikans as a National population are an underclass frozen at the bottom of the American economy.

Memorandum in Support at 22. Defendants argue that as a colonized people engaged in a struggle for self-determination, New Afrikans are entitled to judicial recognition of the war-like nature of their struggle. They assert:

> The New Afrikan Liberation Struggle is acknowledged and respected in many parts of the world, especially in nations

4. The conclusion that the political offense exception does not apply to this case necessarily requires rejection of defendants' alternative request for jury instructions on the issue of political offenses. However, I note that even if the factual issues necessary to determine whether an act qualified for the political events exception were relevant, those issues would be for the Court to determine. The jury's function is limited to questions of guilt or innocence. Arguments invoking the political offense concept constitute, in effect, a challenge to the subject matter jurisdiction of the trial court. That is an issue of law; any factual issues necessary for its resolution would be for the Court to hear and determine. In consequence, I declined to charge the jury on the issue, even though the merits of defendants' motion had not yet been addressed.

that were former colonies of European powers, but the American government has never afforded this Movement the international rights and protections it so justly deserves.

We believe that the struggle waged by New Afrikan/Black people against racial oppression in American [sic] incorporates all the elements of warfare, that the petitioner [Shakur] has demonstrated his resistance to that oppression in the war, and that he should be accorded prisoner of war status while held in the custody of the United States Government.

Reply Memorandum at 5.

In short, on this branch of their motion defendants do not seek to extend by analogy to the case at bar principles derived from a separate body of law. On the contrary, they appeal directly to principles of international law.

■ International law, "formerly known as the law of nations", *Filartiga v. Pena-Irala*, 630 F.2d 876, 877 (2d Cir.1980), is a component of this Nation's domestic law, enforceable in federal courts. International law exists in the federal courts independent of acts of Congress, an existence implicit in Chief Justice Marshall's observation in *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch), 34, 67, 2 L.Ed. 208 (1804): "an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains . . ." (quoted in *Filartiga, supra*, at 887 n. 20). Marshall subsequently stated in *The Nereide*, 13 U.S. (9 Cranch) 388, 422, 3 L.Ed. 769 (1815), that in the absence of a congressional enactment, United States courts are "bound by the law of nations, which is a part of the law of the land." The same theme appears in *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900): "International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination." *See generally Filartiga, supra* at 886–87.

■ The sources of international law enforceable in the federal courts are treaties ratified by the United States; executive or legislative acts declaring the principle sought to be enforced; the decision of an appellate court binding upon the trial court; and, in the absence of any of these, a more amorphous but nonetheless well-recognized body of authority. The "law of nations", the Supreme Court said in *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820), "may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law." The Court expanded on that concept in *The Paquete Habana, supra*, 175 U.S. at 700, 20 S.Ct. at 299:

"For this purpose, where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is."

The defendants at bar, claiming a prisoner of war status exempting them from prosecution under these indictments, rely primarily upon two sources of international law. The first is the Geneva Convention Relative to the Protection of Prisoners of War of August 12, 1949 (6 U.S.T. 3316, T.I.A.S. No. 3364), which the United States has ratified. Second, defendants rely upon principles articulated in the first of two Protocols to the Geneva Conventions of 1949 which, in 1977, the Swiss government opened for signature. Those two Protocols to the Geneva Conventions were negotiated during a four year period at the Diplomatic Conference on the Reaffirmation and Development of International Humanitarian Law in Armed Conflict, convened by the Swiss government. Protocol I deals with international armed conflicts. Consistent

with their view that "the Provisional Government of the Republic of New Afrika in legal, political, and international affairs" represents New Afrikans struggling for independence, brief in support at 6, defendants lay particular emphasis upon Protocol I. Protocol II deals with internal armed conflicts, generally referred to as civil wars. The President of the United States recommended ratification of Protocol II to the Senate, but recommended against ratification of Protocol I.

I consider the Geneva Convention and Protocol I separately.

 As to the Convention, defendants observe that Article 2 provides that the Convention "shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, *even if the state of war is not recognized by one of them.*" (emphasis added). From that disclaimer, defendants pass on to Article 4, which defines "prisoners of war" in part as follows:

"A. Prisoners of war, in the sense of the present Convention, are persons belonging to one of the following categories, who have fallen into the power of the enemy:

(1) Members of the armed forces of a Party to the conflict, as well as members of militias or volunteer corps forming part of such armed forces.

(2) Members of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a Party to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfil the following conditions:

 (a) that of being commanded by a person responsible for his subordinates;

 (b) that of having a fixed distinctive sign recognizable at a distance;

 (c) that of carrying arms openly;

 (d) that of conducting their operations in accordance with the laws and customs of war.

(3) Members of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power."

The United States responds with the argument that Article 4 of the Convention cannot apply to these defendants since the case at bar does not involve armed conflict "between two or more of the High Contracting Parties," as defined in Article 2. In other words, although the Convention applies even if a state of war is not recognized by one of such Parties, nonetheless the conflict must be between two or more High Contracting Parties. However the Provisional Government of the Republic of New Afrika may be characterized, the United States continues, it is not a High Contracting Party to the Geneva Conventions. Accordingly, the government concludes, the only applicable provisions of the Convention are found in Article 3, applicable to internal armed conflicts "not of an international character", whose provisions do not include references to prisoners of war.

In my view, the United States is correct in arguing for the non-applicability of Article 4 of the Convention to the Republic of New Afrika, or to these defendants. But even if that were not so, it is entirely clear that these defendants would not fall within Article 4, upon which they initially relied. Article 4(A)(2) requires that to qualify as prisoners of war, members of "organized resistance movements" must fulfill the conditions of command by a person responsible for his subordinates; having a fixed distinctive sign recognizable at a distance; carrying arms openly; and conducting their operations in accordance with the laws and customs of war. The defendants at bar and their associates cannot pretend to have fulfilled those conditions. For comparable reasons, Article 4(3)'s reference to members of "regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power", also relied upon by defendants, does not apply to the circumstances of this case.

I come then to Protocol I of 1977.

The Conference which resulted in the Protocols was convened largely to address concerns of new nations that the laws of war did not reflect the reality of modern warfare, particularly in the context of wars of national liberation. It was approached "with caution and concern" by the United States delegation.

> [W]e had seen in other contexts the risk that conferences of one hundred or more countries would be dominated by a majority of developing countries, a majority of which all too often seems to be led by radical states bearing grudges against the wealthy countries in general and against the United States in particular. These concerns were, in fact, justified as shown by the political debates during the first two sessions.... Consistent with these concerns, we approached the Conference as more of a hazard than an opportunity.

Report of the United States Delegation to the Conference, Fourth Session, at 28–29, quoted in the government's Memorandum in Response at 4–5.

Defendants rely on Protocol I's treatment of Combatant and Prisoner of War Status as support for the present claim. *See* Articles 43–47, Protocol I. The United States Ambassador to the Conference, George H. Aldrich, has termed Protocol I's approach to the problem of prisoner of war status as "comprehensive and novel." Aldrich, *Guerilla Combatants and Prisoner of War Status*, 31 Am.Univ.L.Rev. 871, 874 (1982).

The novel and comprehensive approach undertaken by Protocol I is rooted in its definition of the armed forces of a Party to a conflict, which are expansively defined as "all organized armed forces, groups and units which are under a command responsible to that Party for the conduct of its subordinates, even if that Party is represented by a government or an authority not recognized by an adverse Party. Such armed forces shall be subject to an internal disciplinary system which, *inter alia,* shall enforce compliance with the rules of international law applicable in armed conflict." Article 43, quoted in Aldrich, *supra,* at 874 n. 2.

Under this approach, the key issue for determining whether a person is a member of armed forces entitled to prisoner of war status is a factual issue, i.e. the existence of a command link from a Party to the conflict to the alleged prisoner of war, rather than a political issue, i.e. recognition by the adverse Party. Article 45 places the burden of proof on this issue squarely on the detaining power, which provides:

> A person who takes part in hostilities and falls into the power of an adverse Party shall be presumed to be a prisoner of war ... if he claims the status of prisoner of war, or if he appears to be entitled to such status, or if the Party on which he depends claims such status on his behalf.

Quoted in Aldrich, *supra,* at 875.

Defendants argue that Protocol I, and its expanded entitlement to prisoner of war status, form a part of that international law which the federal courts are bound to apply.

The government does not quarrel with the general proposition that federal courts are bound to apply international law. However, the Supreme Court in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964), said that "United States courts apply international law as a part of our own *in appropriate circumstances* " (emphasis added); and the government argues that the case at bar does not present an appropriate situation for application of international law. In any event, the government contends that the treatment of the prisoner of war question in Protocol I does not reflect the current state of international law.[5]

---

5. Nor does the government in any event concede that Shakur would meet the requirements of a prisoner of war under Protocol I. The government argues that "even if Protocol I were in force for the United States, any non-State party claiming benefits under the Protocol would at a minimum have to demonstrate that that (1) an international armed conflict exists within the meaning of Article 1 and that the conflict qualifies as a war of liberation under

The *Sabbatino* case is instructive on the issue of when it is appropriate for United States courts to apply international law as part of our own, and when it is not. *Sabbatino* arose out of the expropriation by the Castro government in Cuba, shortly after coming to power, of an American corporation's property interest in sugar subject to Cuba's territorial jurisdiction. A cargo of the expropriated sugar having been shipped to New York, litigation commenced in the federal courts to determine the rights to its proceeds, as between the Cuban government and the former corporate owner. Cuba based its claim on the act of state doctrine, which "in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." 376 U.S. at 401, 84 S.Ct. at 926. The District Court conceded that the corporation's property interest in the sugar was subject to Cuba's territorial jurisdiction, and acknowledged the act of state doctrine; but nevertheless rendered summary judgment against Cuba, ruling that the doctrine was inapplicable when the questioned act violated international law. In that regard, the United States State Department had described the Cuban expropriation law as "manifestly in violation of those principles of international law which have long been accepted by the free countries of the West." *Id.* at 402–03, 84 S.Ct. at 927. The Court of Appeals affirmed; but the Supreme Court reversed and remanded, on the ground that it was inappropriate for the judicial branch to "examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this coun-

try by the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law." *Id.* at 428, 84 S.Ct. at 940.

Central to the Court's analysis was the lack of international uniformity on the law of expropriation. Justice Harlan wrote generally for the Court in *Sabbatino:*

"It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice." 376 U.S. at 428, 84 S.Ct. at 940.

He then observed with particularity:

"There are few if any issues in international law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property of aliens." *Ibid.* (footnote omitted).

And Justice Harlan continued at 430, 84 S.Ct. at 941:

"The disagreement as to relevant international law standards reflects an even more basic divergence between the national interests of capital importing and capital exporting nations and between the social ideologies of those countries that favor state control of a considerable portion of the means of production and those that adhere to a free enterprise system. It is difficult to imagine the courts of this country embarking on ad-

---

the politicized criteria contained [therein]; (2) that the strict requirements of Article 96 were met (filing by a national liberation movements of the required declaration to assume all duties under the Convention and the Protocols with the Swiss Government); and (3) that the combatant requirements of Article[s] 43 and 44 were met." Memorandum in Response at 32. In this regard, Ambassador Aldrich has noted that Protocol I is unlikely to be applied in situations involving wars of liberation. He writes: "In the liberation war ... now identified as an international armed conflict [by Protocol I], the state

allegedly suppressing the liberation movement is most unlikely to agree that the war is, in fact, a liberation war to which the Protocol applies, and, therefore the very relevance of the rule of law is almost certain to be rejected by at least one of the two powers in a position to apply it. Thus the new provisions on guerrillas in Protocol I are likely to affect practice only in occupied territory, and they should not be judged in the politically polarized light of liberation wars." 31 Am.Univ.L.Rev. at 875. In the view I take of the case, I need not reach that issue.

judication in an area which touches more sensitively the practical and ideological goals of the various members of the community of nations." (footnote omitted).

That passage is particularly applicable to the case at bar because "[o]ne of the main reasons for convening the Diplomatic Conference was the view of many Third World countries that the strict international standards on what constitutes an international armed conflict should be broadened to include so-called wars of national liberation. This view was not shared by the United States and its major allies." Government brief in opposition at 9. That basic division among the nations is precisely the sort of ideological division which prompted the Supreme Court in *Sabbatino* to reverse the lower courts for undertaking to apply "international law" to the rights and obligations of the parties.

Although the United States delegation originally endorsed Protocol I, the matter was studied further, and in the event President Reagan recommended against its ratification. In the President's view, Protocol I "politicizes humanitarian law and purports to eliminate the traditional distinction between international and non-international conflicts in a harmful manner"; "grants combatant status to irregular forces in certain circumstances even if they do not satisfy the traditional requirements to distinguish themselves from the civilian population and otherwise comply with the existing laws of war"; and is "not acceptable as a new norm of international law." Government brief in opposition at 10. As noted, the Senate has not ratified Protocol I.

The United States argues at bar that the President's decision not to recommend ratification of Protocol I constitutes a "controlling executive act." Brief in Opposition at 14. From that premise, the United States argues that under *The Pacquete Habana, supra,* this Court cannot look to international law, since *The Pacquete Habana* "stands for the proposition that customary international law applies only where there is no treaty and controlling executive, legislative or judicial action and where it becomes necessary to resort to customary law to determine the applicable law." *Id.* at 13.

I am not prepared to carry that submission to its logical conclusion. One can conceive of the executive branch of government taking a "controlling act" which flies in the face of the law of all civilized nations. I am reluctant to conclude that an independent judiciary would be powerless to enforce an otherwise universally accepted rule of international law, lest it be compared with the compliant Nazi judges in Hitler Germany. But the question arises only in the presence of "a settled rule of international law" by "the general assent of civilized nations", *The Paquete Habana, supra,* 175 U.S. at 694, 20 S.Ct. at 297; and that degree of uniformity is difficult to demonstrate, as Judge Kaufman made clear in *Filartiga, supra.* After an exhaustive review of conventions, treaties, and legal writings, the Court of Appeals concluded in *Filartiga* that "deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights, regardless of the nationality of the parties." 630 F.2d at 878. However, the opinion cautions:

> "The requirement that a rule command the "general assent of civilized nations" to become binding upon them all is a stringent one. Were this not so, the courts of one nation might feel free to impose idiosyncratic legal rules upon others, in the name of applying international law. Thus, in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the Court declined to pass on the validity of the Cuban government's expropriation of a foreign-owned corporation's assets, noting the sharply conflicting views on the issue propounded by the capital-exporting, capital-importing, socialist and capitalist nations. *Id.* at 428–30, 84 S.Ct. at 940–41."
> *Id.* at 881.

The defendants at bar have not made the requisite showing. The record before me does not indicate with any precision how many countries have formally obligated themselves to the terms of Protocol I.

However, one source indicates that as of October, 1980 the Protocol was formally accepted by only 15 nations. *See Aldrich, New Life for the Laws of War,* 75 Am.J. Int'l.L. 764 (1981) (Botsawna, Cyprus, El Salvador, Ecuador, Ghana, Jordan, Libya, Niger, Sweden, Tunisia, Yugoslavia, Mauritania, Gabon, the Bahamas and Finland).

This apparent slight acceptance of the text of Protocol I is itself evidence that its terms lack the general assent of international law. In addition, defendants refer me to no instance where Protocol I's definition of prisoner of war status was actually enforced, and I have found no such instance in my own research. The only reported case in this country rejects the claim. *United States v. Morales,* 464 F.Supp. 325 (E.D.N.Y. 1979). This lack of utilization indicates that the prisoner of war definition in Protocol I has not achieved that level of "custom and usage" necessary to elevate its principles to the status of international law.

■ It follows that the present defendants are not asking an independent judiciary to make universally accepted international law a part of domestic law, notwithstanding the opposition of an intransigent and tyrannical executive. Rather, on an issue which has divided and continues to divide the nations of the world, defendants ask this Court to ignore the President's decision to recommend rejection of Protocol I, and to act as if the Senate had ratified the Protocol, whereas in fact it has not. The judiciary lacks authority thus to intervene in issues committed by the Constitution to coordinate political departments. *See, e.g., Greenham Women Against Cruise Missiles v. Reagan,* 755 F.2d 34, 37 (2d Cir.1985), citing *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962) among other cases.

This conclusion is not inconsistent with *United States v. Libellants and Claimants of the Schooner Amistad,* 15 Peters (40 U.S.) 518, 10 L.Ed. 826 (1841), upon which defendants place considerable reliance by way of analogy. The Amistad was a Spanish vessel bound on a voyage between Cuban ports. She was carrying African negroes who had been kidnapped in Africa and unlawfully transported to Cuba, in violation of the laws and treaties of Spain, which had abolished the African slave trade. During the voyage the Africans rose in rebellion, took possession of the vessel, and killed the captain and crew. The vessel was thereafter seized off Long Island by a United States naval vessel and brought into the District of Connecticut, where her Spanish owners commenced an action in admiralty to recover the vessel and their property, including the "slaves." The Africans intervened and asserted their rights to liberty. The present defendant analogize the situation of the Amistad Africans to the citizens of the present Republic of New Afrika.

While the Supreme Court in the *Amistad* declared the Africans to be free, its rationale does not provide an analogy to the case at bar. The Court did not look beyond the domestic laws of Spain, which it regarded as dispositive. The Court stated preliminarily:

"If these negroes were, at the time, lawfully held as slaves under the laws of Spain, and recognised by those laws as property capable of being lawfully bought and sold; we see no reason why they may not justly be deemed within the intent of the treaty, to be included under the denomination of merchandise, and, as such, ought to be restored to the claimants: for, upon that point, the laws of Spain would seem to furnish the proper rule of interpretation." *Id.* at 593.

The "treaty" referred to in this passage was a treaty between the United States and Spain governing, *inter alia,* the rescue of ships and "merchandise out of the hands of both pirates and robbers." The Spanish claimants relied upon that treaty. However, as noted, the African slave trade constituted a "violation of the laws and treaties of Spain, and the most solemn edicts and declarations of that government." *Ibid.* Consequently, the claims of the owners of the Amistad failed, for this explicit reason:

"If, then, these negroes are not slaves, but are kidnapped Africans, who by the

laws of Spain itself, are entitled to their freedom, and were kidnapped and illegally carried to Cuba, and illegally detained and restrained on board of the Amistad; there is no pretence to say, that they are pirates or robbers. We may lament the dreadful acts, by which they asserted their liberty, and took possession of the Amistad, and endeavoured to regain their native country; but they cannot be deemed pirates or robbers in the sense of the law of nations, or the treaty with Spain, or the laws of Spain itself; at least so far as those laws have been brought to our knowledge." *Id.* at 593–94.

The *Amistad* holding bears no meaningful resemblance to the case at bar, where defendants are charged with violations of federal and state penal laws committed within the pertinent jurisdictions.[6]

The parties' able briefs and the brief *amicus* raise other issues, but I have concluded that I need not discuss them.

For the foregoing reasons, the defendants' effort to avoid the charges contained in these indictments lacks foundation in international or domestic law. Their motions are accordingly denied in their entirety.

It is SO ORDERED.

---

**6.** The view of the *Amistad* Court, that black men and women were "merchandise" if domestic law so provided, is of course offensive to modern sensibilities. It is sobering to reflect that in 1841, the year the Supreme Court decided *Amistad,* Spain was enlightened on the issue of slavery and the United States was not. Much still lay in this nation's future: the *Dred Scott* decision in 1857 (rejecting an appeal to "the laws and usages of nations" in favor of domestic law recognizing property rights over slaves, 60 U.S. (19 How.) 393 at 451, 15 L.Ed. 691); the Civil War, among whose precipitating causes that decision may be numbered; the Emancipation Proclamation; the Thirteenth and Fourteenth Amendments; the post-bellum civil rights statutes; and, in our own century, the cleansing and healing influences of the voting rights statues and *Brown v. Board of Education.* But it is necessary to consider *Amistad's* distressing rationale to appreciate that its holding does not support the present defendants' appeal to international law.