# Status of Taliban Forces Under Article 4 of the Third Geneva Convention of 1949

The President has reasonable factual grounds to determine that no members of the Taliban militia are entitled to prisoner of war status under Article 4 of the 1949 Geneva Convention (III) Relative to the Treatment of Prisoners of War.

February 7, 2002

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked for our Office's views concerning the status of members of the Taliban militia under Article 4 of the 1949 Geneva Convention (III) Relative to the Treatment of Prisoners of War ("GPW"). Assuming the accuracy of various facts provided to us by the Department of Defense ("DoD"), we conclude that the President has reasonable factual grounds to determine that no members of the Taliban militia are entitled to prisoner of war ("POW") status under GPW. First, we explain that the Taliban militia cannot meet the requirements of Article 4(A)(2), because it fails to satisfy at least three of the four conditions of lawful combat articulated in Article 1 of the Annex to the 1907 Hague Convention (IV) Respecting the Laws and Customs of War on Land ("Hague Convention"), which are expressly incorporated into Article 4(A)(2). Second, we note that neither Article 4(A)(1) nor Article 4(A)(3) apply to militia, and that the four conditions of lawful combat contained in the Hague Convention also govern Article 4(A)(1) and (3) determinations in any case. Finally, we explain why there is no need to convene a tribunal under Article 5 to determine the status of the Taliban detainees.

## I.

Article 4(A) of GPW defines the types of persons who, once they have fallen under the control of the enemy, are entitled to the legal status of POWs. The first three categories are the only ones relevant to the Taliban. Under Article 4(A)(1), individuals who are "members of the armed forces of a Party to the conflict," are entitled to POW status upon capture. Article 4(A)(3) includes as POWs members of "regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power."

Article 4(A)(2) includes as POWs members of "other militias" and "volunteer corps," including "organized resistance movements" that belong to a Party to the conflict. In addition, members of militias and volunteer corps must "fulfill" four conditions: (a) "being commanded by a person responsible for his subordinates"; (b) "having a fixed distinctive sign recognizable at a distance"; (c) "carrying arms openly"; and (d) "conducting their operations in accordance with the laws and customs of war." Those four conditions reflect those required in the 1907 Hague

1

Convention IV. *See Commentary to the Geneva Convention Relative to the Treatment of Prisoners of War* 49 (Red Cross 1952) ("*Red Cross Commentary*") ("[D]uring the 1949 Diplomatic Conference . . . there was unanimous agreement that the categories of persons to whom the Convention is applicable must be defined, in harmony with the Hague Regulations.").

Should "any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4," GPW Article 5 requires that these individuals "enjoy the protections of" the Convention until a tribunal has determined their status.

Thus, in deciding whether members of the Taliban militia qualify for POW status, the President must determine whether they fall within any of these three categories. Under Article II of the Constitution, the President possesses the power to interpret treaties on behalf of the Nation. Memorandum for John Bellinger, III, Senior Associate Counsel and Legal Adviser to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority of the President to Suspend Certain Provisions of the ABM Treaty* (Nov. 15, 2001). This includes, of course, the power to apply treaties to the facts of a given situation. Thus, the President may interpret GPW, in light of the known facts concerning the operation of Taliban forces during the Afghanistan conflict, to find that all of the Taliban forces do not fall within the legal definition of POW. A presidential determination of this nature would eliminate any legal "doubt" as to the prisoners' status, as a matter of domestic law, and would therefore obviate the need for Article 5 tribunals.

We believe that, based on the facts provided by the Department of Defense, *see* Rear Admiral L.E. Jacoby, U.S. Navy, J-2, Information Paper, *Subject: Background Information on Taliban Forces* (Feb. 6, 2002), the President has reasonable grounds to conclude that the Taliban, as a whole, is not legally entitled to POW status under Article 4(A)(1) through (3).

## II.

As the Taliban have described themselves as a militia, rather than the armed forces of Afghanistan, we begin with GPW's requirements for militia and volunteer corps under Article 4(A)(2). Based on the facts presented to us by DoD, we believe that the President has the factual basis on which to conclude that the Taliban militia, as a group, fails to meet three of the four GPW requirements, and hence is not legally entitled to POW status.

First, there is no organized command structure whereby members of the Taliban militia report to a military commander who takes responsibility for the actions of his subordinates. The Taliban lacks a permanent, centralized communications infrastructure. Periodically, individuals declared themselves to be "commanders"

and organized groups of armed men, but these "commanders" were more akin to feudal lords than military officers. According to DoD, the Taliban militia functioned more as many different armed groups that fought for their own tribal, local, or personal interests.

Moreover, when the armed groups organized, the core of the organization was often al Qaeda, a multinational terrorist organization, whose existence was not in any way accountable to or dependent upon the sovereign state of Afghanistan. We have previously concluded, as a matter of law, that al Qaeda members are not covered by GPW. *See* Memorandum for Alberto R. Gonzales, Counsel to the President and William J. Haynes II, General Counsel of the Department of Defense, from Jay S. Bybee, Assistant Attorney General, *Re: Applications of Treaties and Laws to al Qaeda and Taliban Detainees* (Jan. 22, 2002). After October 7, when the United States armed forces began aerial bombing of al Qaeda and Taliban targets in Afghanistan, the distinction between Taliban and al Qaeda became even more blurred as al Qaeda assumed the lead in organizing the defense.

DoD's facts suggest that to the extent the Taliban militia was organized at all, it consisted of a loose array of individuals who had shifting loyalties among various Taliban and al Qaeda figures. According to DoD, the Taliban lacked the kind of organization characteristic of the military. The fact that at any given time during the conflict the Taliban were organized into some structured organization does not answer whether the Taliban leaders were responsible for their subordinates within the meaning of GPW. Armed men who can be recruited from other units, as DoD states, through defections and bribery are not subject to a commander who can discipline his troops and enforce the laws of war.

Second, there is no indication that the Taliban militia wore any distinctive uniform or other insignia that served as a "fixed distinctive sign recognizable at a distance." DoD has advised us that the Taliban wore the same clothes they wore to perform other daily functions, and hence they would have been indistinguishable from civilians. Some have alleged that members of the Taliban would wear black turbans, but apparently this was done by coincidence rather than design. Indeed, there is no indication that black turbans were systematically worn to serve as an identifying feature of the armed group.

Some of the Taliban militia carried a tribal flag. DoD has stated that there is no indication that any individual members of the Taliban wore a distinctive sign or insignia that would identify them if they were not carrying or otherwise immediately identified with a tribal flag. Moreover, DoD has not indicated that tribal flags marked only military, as opposed to civilian, groups.

Third, the Taliban militia carried arms openly. This fact, however, is of little significance because many people in Afghanistan carry arms openly. Although Taliban forces did not generally conceal their weapons, they also never attempted to distinguish themselves from other individuals through the arms they carried or the manner in which they carried them. Thus, the Taliban carried their arms

openly, as GPW requires military groups to do, but this did not serve to distinguish the Taliban from the rest of the population. This fact reinforces the idea that the Taliban could neither be distinguished by their uniforms and insignia nor by the arms they carried from Afghani civilians.

Finally, there is no indication that the Taliban militia understood, considered themselves bound by, or indeed were even aware of, the Geneva Conventions or any other body of law. Indeed, it is fundamental that the Taliban followed their own version of Islamic law and regularly engaged in practices that flouted fundamental international legal principles. Taliban militia groups have made little attempt to distinguish between combatants and non-combatants when engaging in hostilities. They have killed for racial or religious purposes. Furthermore, DoD informs us of widespread reports of Taliban massacres of civilians, raping of women, pillaging of villages, and various other atrocities that plainly violate the laws of war.

Based on the above facts, apparently well known to all persons living in Afghanistan and joining the Taliban, we conclude that the President can find that the Taliban militia is categorically incapable of meeting the Hague conditions expressly spelled out in Article 4(A)(2) of GPW.

## III.

One might argue that the Taliban is not a "militia" under Article 4(A)(2), but instead constitutes the "armed forces" of Afghanistan. Neither Article 4(A)(1), which grants POW status to members of the armed forces of a state party, nor Article 4(A)(3), which grants POW status to the armed forces of an unrecognized power, defines the term "armed forces." Unlike the definition of militia in Article 4(A)(2), these two other categories contain no conditions that these groups must fulfill to achieve POW status. Moreover, because GPW does not expressly incorporate Article 4(A)(2)'s four conditions into either Article 4(A)(1) or (3), some might question whether members of regular armed forces need to meet the Hague conditions in order to qualify for POW status under GPW.

We conclude, however, that the four basic conditions that apply to militias must also apply, at a minimum, to members of armed forces who would be legally entitled to POW status. In other words, an individual cannot be a POW, even if a member of an armed force, unless forces also are: (a) "commanded by a person responsible for his subordinates"; (b) "hav[e] a fixed distinctive sign recognizable at a distance"; (c) "carry[] arms openly"; and (d) "conduct[] their operations in accordance with the laws and customs of war." Thus, if the President has the factual basis to determine that Taliban prisoners are not entitled to POW status under Article 4(A)(2) as members of a militia, he has the grounds to also find that they are not entitled to POW status as members of an armed force under either Article 4(A)(1) or Article 4(A)(3).

Article 4(A)'s use of the phrase "armed force," we believe, incorporated by reference the four conditions for militia, which originally derived from the Hague Convention IV. There was no need to list the four Hague conditions in Article 4(A)(1) because it was well understood under preexisting international law that all armed forces were already required to meet those conditions. As would have been understood by the GPW's drafters, use of the term "armed forces" incorporated the four criteria, repeated in the definition of militia, that were first used in the Hague Convention IV.

The view that the definition of an armed force includes the four criteria outlined in Hague Convention IV and repeated in GPW is amply supported by commentators. As explained in a recently-issued Department of the Army pamphlet, the four Hague conditions are

> arguably part and parcel of the definition of a regular armed force. It is unreasonable to believe that a member of a regular armed force could conduct military operations in civilian clothing, while a member of the militia or resistance groups cannot. Should a member of the regular armed forces do so, it is likely that he would lose his claim to immunity and be charged as a spy or as an illegal combatant.

Major Geoffrey S. Corn & Major Michael L. Smidt, *"To Be Or Not To Be, That Is The Question": Contemporary Military Operations and the Status of Captured Personnel*, Army Law., June 1999, at 1, 14 n.127 (citation omitted). One scholar has similarly concluded that "[u]nder the Hague Convention, a person is a member of the armed forces of a state only if he satisfies the [four enumerated] criteria." Gregory M. Travalio, *Terrorism, International Law, and the Use of Military Force*, 18 Wis. Int'l L.J. 145, 184 n.140 (2000). *See also* Michael N. Schmitt, *Bellum Americanum: The U.S. View of Twenty-First Century War and Its Possible Implications For the Law of Armed Conflict*, 19 Mich. J. Int'l L. 1051, 1078 (1998) ("[U]nder the Regulations annexed to Hague Convention IV, combatants were those who were members of the regular armed forces (or formal militia), were commanded by a person responsible for their conduct, wore a fixed distinctive emblem (or uniform), carried their weapons openly, and conducted operations in accordance with the law of war. The 1949 Geneva Convention on Prisoners of War extended this status to members of an organized resistance movement which otherwise complied with the Hague IV requirements.").

Further, it would be utterly illogical to read "armed forces" in Article 4(A)(1) and (3) as somehow relieving members of armed forces from the same POW requirements imposed on members of a militia. There is no evidence that any of the GPW's drafters or ratifiers believed that members of the regular armed forces ought to be governed by *lower standards* in their conduct of warfare than those

applicable to militia and volunteer forces. Otherwise, a sovereign could evade the Hague requirements altogether simply by designating all combatants as members of the sovereign's regular armed forces. A sovereign, for example, could evade the status of spies as unlawful combatants simply by declaring all spies to be members of the regular armed forces, regardless of whether they wore uniforms or not. Further, it would make little sense to construe GPW to deny some members of militias or volunteer corps POW protection for failure to satisfy the Hague conditions (under Article 4(A)(2)), while conferring such status upon other members simply because they have become part of the regular armed forces of a party (under Article 4(A)(1)).

This interpretation of "armed force" in GPW finds direct support in the International Committee of the Red Cross ("ICRC"), the non-governmental organization primarily responsible for, and most closely associated with, the drafting and successful completion of GPW. After the Conventions were established, the Committee started work on a Commentary on all of the Geneva Conventions. In its discussion of Article 4(A)(3) of GPW, the ICRC construed both Article 4(A)(1) and (3) to require all regular armed forces to satisfy the four Hague IV (and Article 4(A)(2)) conditions:

> [t]he expression "members of regular armed forces" denotes armed forces which differ from those referred to in sub-paragraph (1) of this paragraph in one respect only: the authority to which they profess allegiance is not recognized by the adversary as a Party to the conflict. These "regular armed forces" have all the material characteristics and all the attributes of armed forces in the sense of sub-paragraph (1): they wear uniform, they have an organized hierarchy and they know and respect the laws and customs of war. The delegates to the 1949 Diplomatic Conference were therefore fully justified in considering that there was no need to specify for such armed forces the requirements stated in sub-paragraph (2) (a), (b), (c) and (d).

*Red Cross Commentary* at 62-63 (emphasis added).

Numerous scholars have similarly interpreted GPW as applying the four conditions to Article 4(A)(1) and (3) as well as to Article 4(A)(2). As Professor Howard S. Levie, a leading expert on the laws of war and the Geneva Conventions in particular, has explained in his authoritative treatise:

> This enumeration [of the four conditions] does not appear in subparagraph 1, dealing with the regular armed forces. This does not mean that mere membership in the regular armed forces will automatically entitle an individual who is captured to prisoner-of-war status if his activities prior to and at the time of capture have not met these

requirements. The member of the regular armed forces wearing civilian clothes who is captured while in enemy territory engaged in an espionage or sabotage mission is entitled to no different treatment than that which would be received by a civilian captured under the same circumstances. Any other interpretation would be unrealistic as it would mean that the dangers inherent in serving as a spy or saboteur could be immunized merely by making the individual a member of the armed forces; and that members of the armed forces could act in a manner prohibited by other areas of the law of armed conflict and escape the penalties therefore, still being entitled to prisoner-of-war status.

Howard S. Levie, 59 *International Law Studies: Prisoners of War in International Armed Conflict* 36-37 (Naval War College 1977). Oxford Professor Ingrid Detter has similarly concluded that, under the 1949 Geneva Conventions,

> to be a combatant, a person would have to be:
>
> (a) commanded by a person responsible for his subordinates;
>
> (b) having a fixed distinctive sign recognizable at a distance;
>
> (c) carrying arms openly;
>
> (d) conducting their operations in accordance with the laws and customs of war.
>
> The same requirements as apply to irregular forces are presumably also valid for members of regular units. However, this is not clearly spelt out: there is no textual support for the idea that members of regular armed forces should wear uniform. On the other hand, there is ample evidence that this is a rule of law which has been applied to a number of situations to ascertain the status of a person. Any regular soldier who commits acts pertaining to belligerence in civilian clothes loses his privileges and is no longer a lawful combatant. "Unlawful" combatants may thus be either members of the regular forces or members of resistance or guerilla movements who do not fulfil the conditions of lawful combatants.

Ingrid Detter, *The Law of War* 136-37 (Cambridge 2d ed. 2000) (footnotes omitted). *See also* Christopher C. Burris, *The Prisoner of War Status of PLO Fedayeen*, 22 N.C. J. Int'l L. & Com. Reg. 943, 987 n.308 (1997) ("I am using Article 4A(2)'s four criteria because the armed forces of the Palestinian Authority, over

30,000 men under arms organized into roughly ten or more separate para-military units, are more characteristic of militia units than the regular armed forces of a state. This is because these units are organized as police/security units, not exclusive combat units. *See* Graham Usher, *Palestinian Authority, Israeli Rule*, The Nation, Feb. 5, 1996, at 15, 16. Whether the Palestinian Authority's forces are considered militia or members of the armed forces, they still must fulfill Article 4A(2)'s four criteria.").[1]

> Therefore, it is clear that the term "armed force" includes the four conditions first identified by Hague Convention IV and expressly applied by GPW to militia groups. In other words, in order to be entitled to POW status, a member of an armed force must (a) be "commanded by a person responsible for his subordinates"; (b) "hav[e] a fixed distinctive sign recognizable at a distance"; (c) "carry[] arms openly"; and (d) "conduct[] their operations in accordance with the laws and customs of war." We believe that the President, based on the facts supplied by DoD, has ample grounds upon which to find that members of the Taliban have failed to meet three of these four criteria, regardless of whether they are characterized as members of a "militia" or of an "armed force." The President, therefore,

---

[1] The only federal court we are aware of that has addressed this issue denied Article 4(A)(3) status to defendants because they could not satisfy the Hague conditions. In *United States v. Buck*, 690 F. Supp. 1291 (S.D.N.Y. 1988), the defendants claimed that they were entitled to POW status as military officers of the Republic of New Afrika, "a sovereign nation engaged in a war of liberation against the colonial forces of the United States government." *Id*. at 1293. That nation, it was contended, included "all people of African ancestry living in the United States." *Id*. at 1296. The court refused to extend POW status to the defendants. After determining that GPW did not apply at all due to the absence of an armed conflict as understood under Article 2, the court alternatively reasoned that the defendants could not satisfy any of the requirements of Article 4. *See id*. at 1298 (stating that, even if GPW applied, "it is entirely clear that these defendants would not fall within Article 4, upon which they initially relied"). The court first concluded that the defendants failed to meet the four Hague conditions expressly spelled out in Article 4(A)(2). The court then rejected POW status under Article 4(A)(3) "[f]or comparable reasons":

> Article 4(A)(2) requires that to qualify as prisoners of war, members of "organized resistance movements" must fulfill the conditions of command by a person responsible for his subordinates; having a fixed distinctive sign recognizable at a distance; carrying arms openly; and conducting their operations in accordance with the laws and customs of war. The defendants at bar and their associates cannot pretend to have fulfilled those conditions. *For comparable reasons*, Article 4(3)'s reference to members of "regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power," also relied upon by defendants, does not apply to the circumstances of this case.

*Id*. (emphasis added). The court reached this conclusion even though the Hague conditions are not explicitly spelled out in Article 4(A)(3). Nothing in the court's discussion suggests that it would have construed Article 4(A)(1) any differently.

may determine that the Taliban, as a group, are not entitled to POW status under GPW.

## IV.

Under Article 5 of GPW, "[s]hould any doubt arise as to whether persons . . . belong to any of the categories enumerated in Article 4, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal." As we understand it, DoD in the past has presumed prisoners to be entitled to POW status until a tribunal determines otherwise. The presumption and tribunal requirement are triggered, however, only if there is "any doubt" as to a prisoner's Article 4 status.

Under Article II of the Constitution, the President possesses the power to interpret treaties on behalf of the Nation.* We conclude, in light of the facts submitted to us by the Department of Defense and as discussed in parts II and III of this memorandum, that the President could reasonably interpret GPW in such a manner that none of the Taliban forces falls within the legal definition of POWs as defined by Article 4. A presidential determination of this nature would eliminate any legal "doubt" as to the prisoners' status, as a matter of domestic law, and would therefore obviate the need for Article 5 tribunals.

This approach is also consistent with the terms of Article 5. As the International Committee of the Red Cross has explained, the "competent tribunal" requirement of Article 5 applies "to cases of doubt as to whether persons having committed a belligerent act and having fallen into the hands of the enemy belong to any of the categories enumerated in Article 4." *Red Cross Commentary* at 77. Tribunals are thus designed to determine whether a particular set of facts falls within one of the Article 4 categories; they are not intended to be used to resolve the proper interpretation of those categories. The President, in other words, may use his constitutional power to interpret treaties and apply them to the facts, to make the determination that the Taliban are unlawful combatants. This would remove any "doubt" concerning whether members of the Taliban are entitled to POW status.

We therefore conclude that there is no need to establish tribunals to determine POW status under Article 5.

JAY S. BYBEE
*Assistant Attorney General*
*Office of Legal Counsel*

---

*Editor's Note: We have deleted a footnote containing a citation to an earlier Office of Legal Counsel memorandum that was unnecessary to support the proposition in the text, because the cited memorandum no longer reflects the views of this Office.