UNITED STATES of America, Plaintiff,

v.

Jeff FORT, Leon McAnderson, Roosevelt
Hawkins, Alan Knox, Reico Cranshaw,
and Melvin Mayes, Defendants.

No. 86 CR 572.

United States District Court,
N.D. Illinois,
Eastern Division.

April 3, 1996.

Melvin Mayes, Chicago, IL, pro se.

John F. Podliska, Asst. U.S. Atty., Chica-
go, IL, for U.S.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court is the motion of Defen-
dant Melvin Mayes requesting that, because
of his citizenship of the Republic of New
Afrika, he be recognized as a political prison-
er. For the reasons that follow, the motion
is denied.

### I.

Mayes was one of many indicted in 1986
for his connection with the former Chicago
El Rukn street gang. Mayes bolted from
the jurisdiction in 1986; a warrant was is-
sued for his arrest. While Mayes was at
large, Trammel Davis, one of Mayes' co-
defendants, pleaded guilty and testified on
behalf of the government. Mayes' other co-
defendants, including the El Rukn leader
Jeff Fort, proceeded to a jury trial which
lasted from October 7, 1987, to November 24,
1987. Mayes was arrested on the 1986 war-
rant in 1995 and has pleaded "not guilty" to
all counts in the indictment.

To better understand Defendant's refer-
ence to political considerations, one need re-
fer to the facts underlying the charges
against him.[1] The following appeared in the
Seventh Circuit Court of Appeals opinion
deciding the appeals of the other defendants:

> The El Rukns are a Chicago street gang
> with slightly over 100 members. The gang
> began in the 1960's as the Blackstone
> Rangers. In the 1970's, they were known
> as the Black P Stone Nation. In the
> 1980's, Jeff Fort became the undisputed
> leader of the gang and the organization
> was renamed the El Rukns, meaning "cor-

---

1. The court belabors the record due to the in-
creasing number of similar motions being made
and due to the likelihood of more to come in
gang-related criminal cases.

nerstone." The El Rukns, under Fort, became a carefully structured enterprise. Fort, the "Imam", sat at the top of the hierarchy. Beneath him in descending rank were "generals," "Officer Muftis," "ambassadors," and "soldiers" or "Els." Under Fort's leadership, the El Rukns also embraced certain elements of the Black Muslim faith. Their headquarters at 3947 South Drexel was known as the "Mosque," and occasional religious services, educational classes and social gatherings were held there.

In 1984, Jeff Fort began serving a lengthy sentence at the Federal Correctional Institute in Bastrop, Texas. Despite this incarceration, Fort remained the leader and mastermind of the El Rukns. Fort maintained his control over the organization via extensive telephone conversations from Bastrop to the Chicago Headquarters. In order to frustrate federal authorities who were monitoring and recording these conversations, Fort and his chief "general," Melvin Mayes, developed a complex code for use during these conversations.

While in prison in Bastrop, Fort learned that Louis Farrakhan had received $5 million from the Libyan government. Fort determined that at those wages, the El Rukns should become employees of the Libyans as well. Fort decided to offer the services of the El Rukns to the Libyans. According to Fort's plan, the El Rukns would offer to perform terrorist activities within the United States in return for $1 million a year from the Libyan government. On March 11, 1986, El Rukn members Leon McAnderson and Reico Cranshaw, along with Charles Knox (an unindicted co-conspirator), travelled to Libya to meet with military officials of the Libyan government. At these meetings, Cranshaw and McAnderson presented the El Rukns' offer. Fort was informed of this meeting and began planning a way to impress the Libyans and to demonstrate the depth of the El Rukns' commitment to the enterprise. In various conversations, Fort, McAnderson, Cranshaw and others discussed destroying a government building, planting a bomb, blowing up an air-

plane, killing a Milwaukee alderman, or simply committing "a killing here and a killing there" to get the Libyans' attention. Ultimately, Fort decided that it would be more simple to take credit for other people's acts of violence. Thus, a clipping file was established to keep track of particularly violent, but as yet unsolved, crimes throughout the United States. The El Rukns would then send this file to the Libyans and take credit for the mayhem. Fort considered this effort to be "lightweight," and therefore also decided to make a videotape of El Rukns pretending to be from various cities around the country to impress the Libyans with the breadth of the El Rukns' membership.

The hostilities in the Gulf of Sidra between the United States military and Libyan air forces forced McAnderson, Cranshaw and Charles Knox to cancel a planned return trip to Libya in May of 1986. At Fort's instruction, the three flew instead to Panama to meet with Libyan officials at the Libyan mission there. In Panama, they gave the Libyans the videotape made under Fort's orders. Upon their return, customs agents searched McAnderson and Cranshaw's luggage and discovered a document written by Cranshaw vaguely describing various acts of terrorism to be performed for the Libyans.

Near the end of June 1986, Fort decided that the Libyans would only be impressed by the use of powerful explosives. He told Cranshaw and McAnderson to discuss with the Libyans the possibility of providing explosive training for the El Rukns. The true focus of Fort's plan, however, was obtaining a handheld rocket launcher or "LAW" rocket. The LAW rocket (for "light anti-tank weapon") was designed to destroy armored tanks. The blast of the explosive and the intense heat can melt ten to twelve inches of armor plate and can penetrate concrete bunker-type facilities. The plan to purchase this deadly weapon, however, was intercepted by the Federal Bureau of Investigation (FBI).

Ultimately, the FBI, through Special Agent Willie T. Holan and Sam Buford, an informant, contacted Alan Knox, a member

of the El Rukns, and offered to sell him several LAW rockets and other military supplies. Holan had been in the process of setting up Knox for a cocaine sting, but successfully shifted gears and convinced Knox that he was also able to provide high-tech military weapons such as the LAW rocket. The weapon which Holan ultimately provided was inoperative, but appeared to contain a "live" explosive. On July 31, 1986, Knox, under instructions from Fort and Mayes, purchased the rocket for $1800. Knox, Mayes and Roosevelt Hawkins, another member of the El Rukns, met with Buford on that day and exchanged the money for the rocket. Hawkins drove and waited outside with the money while the final terms of the deal were completed. Once the purchase was made, Hawkins then drove the rocket home toward the "Hut," a building owned by the El Rukns at 6414–6416 South Kenwood in Chicago, but experienced car trouble and turned the rocket over to Mayes who transported it the rest of the way.

On August 5, a search of the "Hut" was conducted pursuant to a warrant. The search uncovered the LAW rocket, as well as 32 firearms, including a MAC–10 machine gun, a fully-automatic .45–caliber pistol, and a .45–caliber Commando volunteer carbine, along with several rounds of armor-piercing bullets designed for submachine gun use.

Fort, McAnderson, Cranshaw, Knox and Hawkins were subsequently charged in a 50 count indictment in the Northern District of Illinois for their roles in the conspiracy. The central count was conspiracy to commit terrorist acts in violation of 18 U.S.C. § 371. Other counts charged the defendants with interstate travel and use of the telephone in furtherance of the conspiracy. Still other charges involved the firearms and the explosives. All the defendants save Hawkins were named in all 50 counts of the indictment. Hawkins was named only in counts 1 and 41–45.

A trial began before Judge Charles R. Norgle on October 7, 1987. On November 24, 1987, the jury returned guilty verdicts against all five defendants. Jeff Fort, still serving time on his original sentence, was given an additional 80 years in prison. Leon McAnderson received 51 years; Alan Knox, 54 years; Reico Cranshaw, 63 years; and Roosevelt Hawkins, who was convicted on only 4 counts, 9 years.

*United States v. McAnderson*, 914 F.2d 934, 939–40 (7th Cir.1990) (footnotes omitted).

## II.

Mayes claims that he has been "a citizen of the sovereign Republic of New Afrika" and that his "secession from the United States of America is the motivating factor behind the government's prosecution and has no criminal basis; therefore, it is necessary that your defendant be allowed to articulate his national and political affiliation during his upcoming trial in support of his defense." In its response, the government summarizes the *pro se* motion as one in which Mayes asks the court to recognize him "as a political prisoner in accordance with the Geneva Conventions of 1949 and Protocol 1." The government argues that Mayes has no standing to assert treaty provisions in the United States District Court and that Mayes' motion is frivolous. Mayes supports his position as follows:

> That your defendant's status as a political prisoner is recognized in accord with the Geneva Conventions Relative to the Treatment of Prisoners of War of August 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; and, Protocol I Additional to the Geneva Conventions of August 12, 1949, and relating to the Protection of Victims of International Armed Conflicts, U.S. Docket No. A/32/144 (1977).

And the government translates the citation as follows:

> Geneva Convention Relative to the Protection of Prisoners of August 12, 1949 (6 U.S.T. 3316, T.I.A.S. No. 3364, 75 U.N.T.S. 135) and protocol I to the Geneva Conventions Art. 51, adopted June 8, 1977, U.N. Doc. A/32/144 annex I, reprinted in 16 American Society Int'l, Int'l L. Materials 1391, 1431–2 (1977) (condemning violence designed to spread terror among civilian populations).

The Republic of New Afrika has been described, by persons claiming to speak on its

behalf, as a "nation of Black people within the territorial boundaries of the United States." *Republic of New Afrika v. F.B.I.*, 656 F.Supp. 7, 8 (D.D.C.1985) *aff'd*, 821 F.2d 821 (D.C.Cir.1987). The members of the alleged provisional government of the Republic of New Afrika have advocated the overthrow of the United States by force and violence in those sections of the United States asserted to be the "national territory" of the Republic of New Afrika. *In re the Pro Hac Vice of Chokwe Lumumba*, 526 F.Supp. 163, 164–65 (S.D.N.Y.1981).

■ The government first moves to deny the motion on procedural grounds. Because Mayes is represented by counsel, argues the government, he may not file motions *pro se*. The rule is that a defendant who accepts representation by counsel forfeits the right to represent himself. *Faretta v. California*, 422 U.S. 806, 821, 95 S.Ct. 2525, 2534, 45 L.Ed.2d 562 (1975); *Cain v. Peters*, 972 F.2d 748, 750 (7th Cir.1992). Plaintiff may, however, choose to have counsel act in only a "standby" capacity. Counsel for Mayes has not raised the issue and is aware of the motion. Nevertheless, rather than step into the gyttja of pleadings filed *pro se*, as opposed to "standby counsel" or by court appointed counsel, the court addresses the merits of the motion. *See generally United States v. Seybold*, 979 F.2d 582 (7th Cir. 1992).

■ As a general proposition, individuals do not have standing to assert private rights in domestic courts on the basis of international treaties. For at least 167 years, the law of this country has been that a treaty does not create enforceable private rights unless it expressly or impliedly creates a private claim for relief. *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 311, 7 L.Ed. 415 (1829) (Chief Justice Marshall); *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373–76 (7th Cir.1985); *United States v. Noriega*, 746 F.Supp. 1506, 1532–33 (S.D.Fla. 1990); *Hanoch Tel–Oren v. Libyan Arab Republic*, 517 F.Supp. 542, 546–47 (D.D.C.1981). The courts have consistently held that the Geneva Conventions and Protocol I are not self-executing and, thus, provide no basis for the enforcement of private rights in domestic

courts. *Ahmad v. Wigen*, 726 F.Supp. 389, 406 (E.D.N.Y.1989). Accordingly, Mayes does not have standing by those treaties.

■ Furthermore, the Republic of New Afrika is not a party to the Geneva Convention, the United States has never recognized the alleged republic, and the United States has never ratified Protocol I. *United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir.1984) (no recognition of the Republic of New Afrika by the United States); *Linder v. Portocarrero*, 747 F.Supp. at 1462 (Protocol I not ratified by the United States); *United States v. Noriega*, 746 F.Supp. at 1533 (Protocol I not ratified by USA); *United States v. Buck*, 690 F.Supp. 1291, 1298 (S.D.N.Y.1988) (Republic of New Afrika not a party to Geneva Convention). Therefore, even if Mayes had standing, he would have nothing, proverbially speaking, to stand upon.

In addition, federal courts universally have rejected claims based upon political prisoner status under the Geneva Conventions and Protocol I. Claims based specifically upon alleged citizenship in the Republic of New Afrika have been rejected as frivolous. *E.g., United States v. Shakur*, 817 F.2d 189, 192, 199–200 (2d Cir.1987) (finding frivolous defendant's demand that he be treated in accordance with the Geneva Convention as a "captured Freedom Fighter of the New Afrikan Nation" and a "Prisoner-of-War"); *Buck*, 690 F.Supp. at 1296–1303.

### III.

Accordingly, for each of the foregoing reasons, the motion is denied.

IT IS SO ORDERED.