Kang Joo KWAN, individually and as representative of a class,

and

Se Jeik Park, on behalf of the National Assembly of the Republic of Korea,

and

The Republic of Korea, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

No. Civ.A. 99–181.

United States District Court, E.D. Pennsylvania.

Feb. 11, 2000.

---

Michael Choi, Philadelphia, PA, Stewart J. Eisenberg, Philadelphia, PA, for plaintiff.

Vincent M. Garrey, Carole A. Jeandheur, Sr. Counsel, Dept. of Justice, Washington, DC, for defendant.

## MEMORANDUM

LOWELL A. REED, Jr., Senior District Judge.

Presently before the Court is the motion of the defendant, the United States of America ("United States"), to dismiss (Document No. 13) and the response of the plaintiffs thereto. Also before the Court is the motion of defendant for a protective Order (Document No. 23) and the motion of the plaintiffs for leave to file and correct their memorandum of law (Document No. 21). The United States seeks to dismiss this lawsuit pursuant to Federal Rule of Civil Procedure 12(b), arguing that the plaintiffs lack standing and that the claims are not justiciable. Defendant also argues that the complaint fails to state a claim upon which relief may be granted because the lawsuit is time barred. For the reasons set forth below, the motion to dismiss will be granted.[1]

## I. Background

Procedurally, this case has been beset by delays and at least one false start. On November 20, 1997, plaintiffs filed a complaint alleging, as does the present case, violations by the government of the United States of an agreement between the United States and the Republic of Korea to compensate Korean soldiers who died or were injured during the Vietnam conflict. *See Kang Joo Kwan v. United States,* No. 97–CV–7112. After receiving a one-month extension of time, the defendant moved to dismiss the complaint. Plaintiffs sought and received an unopposed two-month extension to respond to the motion to dismiss. Instead of responding, on June 4, 1998, at the end of the two month period, plaintiffs voluntarily dismissed the 1997 action.

Approximately seven months later, on January 13, 1999, plaintiffs again filed a complaint, thereby instituting this action. This second complaint raises essentially the same claims as were raised in the first action but added another plaintiff. Defendant again moved to dismiss the complaint on March 16, 1999, making essentially the same arguments it made in its motion to dismiss filed in the first action. The Court granted both plaintiffs' initial unopposed motion for a two month extension of time to respond to the motion, and the subsequent unopposed motion for an additional one month extension of time. At the end of the three months, plaintiffs amended their complaint adding the Republic of Korea ("ROK") as a party. Shortly thereafter, plaintiffs filed a response to the motion to dismiss. As the complaint had been amended, the Court dismissed as moot the defendant's motion to dismiss.

The Court granted the unopposed motion of the defendant for an extension of 11 days to respond to the amended complaint. On July 30, 1999, the defendant again filed a motion to dismiss, repeating many of the arguments it made in its previous motion but adding the contention that the plaintiffs had not been authorized to represent the Republic of Korea and that the Republic of Korea could not proceed *parens patriae.* Again, plaintiffs sought, and the defendant did not oppose, a one month extension of time to respond. The defendant did not oppose a subsequent motion for an additional ten days. Plaintiffs then moved for another extension of sixty days to allow for the resolution of "a dispute within the government of Korea as to whether this suit should go forward." (Plaintiff's Opposed Motion for Extension of Time at unnumbered page 2). Defendant opposed this last extension and this Court denied the motion ordering the plaintiffs to respond to the motion. (Document No. 19).

The amended complaint avers that in 1996, the United States Government, under then President Lyndon B. Johnson, committed troops to fight in the Vietnam conflict. (Amended Complaint at ¶ 6).

---

1. The motion of the defendant for a protective Order will be denied as moot. The motion of the plaintiffs for leave to correct their memorandum of law will be granted.

The amended complaint further avers that the United States was "desirous of having the Republic of Korea commit troops to assist the United States' efforts to defend the people and the government of South Vietnam." (*Id.* at ¶ 7). To that end and pursuant to an agreement with the Republic of Korea, the United States agreed to provide death and disability benefits resulting from casualties to ROK troops in Vietnam at rates agreed by the Joint Untied States–Republic of Korea Military Committee. (*Id.* at ¶ 10). Thereafter, on March 4, 1966, the government of the United States, through its ambassador Winthrop Brown, agreed, *inter alia*, to provide death and disability gratuities resulting from casualties in Vietnam at double the rates previously agreed to by the United States–Republic of Korea Military Committee. (*Id.* at ¶ 11). This agreement is referred to as the Brown Commitment and is the basis for the present suit. Presumably, the disability benefits sought in this lawsuit stem from latent injuries suffered by ROK veterans as a result of being exposed to Agent Orange in Vietnam.

The Brown Commitment "has never been made public in the Republic of Korea" and "was not made known to Plaintiff, Kang Joo Kwan, until approximately March, 1996." (*Id.* at ¶ 15). Kwan brings this action now alleging that while serving as a member of the military for the Republic of Korea in South Vietnam, he suffered injuries for which he, as well as other similarly situated ROK veterans, are entitled to receive benefits under the "understandings and agreements, including the Brown Commitment" with the United States. (*Id.* at ¶ 14).

According to the United States, the total number of ROK military personnel deployed to Vietnam during the period 1965–1970 was 47,872. (Affidavit of James G. Hergen, Assistant Legal Adviser for East Asian and Pacific Affairs, Dept. of State at ¶ 10) (citing to hearings held before the Subcommittee on United States Security Agreements and Commitments Abroad of the Committee on Foreign Relation of the United States Senate, 91st Cong., 2d Sess., Part 6, February 24–26, 1970, at 1555 ("SFRC Report")). As of February 7, 1970, cumulative ROK casualties in Vietnam were: 3,094 killed in action; 3,051 wounded in action; and 4 missing in action. (*Id.* at 1556). Total U.S. death and disability payments to the Republic of Korea for the killed and injured ROK forces during this period amounted to $10.5 million. (*Id.* 1571).

Payments under the Brown Commitment were made directly to the Minister of National Defense for the Republic of Korea. The Republic of Korea in turn paid its veterans. Nothing in the Brown Commitment authorizes payment of benefits from the United States directly to individual Korean veterans. (Def.Mem., Exh. 1 at ¶ 19).

## II. Standard

A defendant may challenge the subject matter jurisdiction of a district court in one of two ways. *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977); *Kronmuller v. West End Fire Co. No. 3 Fire Dep't,* 123 F.R.D. 170, 172 (E.D.Pa.1988). First a defendant may challenge subject matter jurisdiction by asserting that the complaint, on its face does not allege sufficient grounds to establish subject matter jurisdiction. *Mortensen,* 549 F.2d at 891. In deciding a facial challenge, the court must assume that the allegations contained in the complaint are true. *Cardio–Medical Assoc., Ltd. v. Crozer–Chester Med. Ctr.,* 721 F.2d 68, 75 (3d Cir.1983). In this circumstance, a court may dismiss the complaint only if it appears to a certainty that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction. *See Mortensen,* 549 F.2d at 891; *Kronmuller,* 123 F.R.D. at 172.

A defendant may also challenge the subject matter jurisdiction of a federal court by factually attacking the jurisdictional allegations of the plaintiff as set forth in the

complaint. *Mortensen,* 549 F.2d at 891. In this circumstance, the "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.; United Transp. Union v. Southeastern Penn. Transp.,* 23 F.Supp.2d 557, 558 (E.D.Pa.1998). Thus, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen,* 549 F.2d at 891. The court may consider affidavits, depositions and testimony to resolve factual issues bearing on jurisdiction. *Gotha v. United States,* 115 F.3d 176, 179 (3d Cir.1997). The plaintiff has the burden of proving that the court has jurisdiction to adjudicate the claims in the complaint. *Mortensen,* 549 F.2d at 891. Although the defendant has not stated whether it is making a facial or factual attack, it is apparent that the attack is both facial and factual. On the one hand, defendant facially attacks the standing of the individual plaintiffs under the Brown Commitment absent a formal complaint by the Republic of Korea. In addition, defendant makes a factual attack on the assertion that the Republic of Korea is a proper party to this case, thereby precluding the individual plaintiffs from having standing as well.[2]

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court must determine whether the plaintiff is entitled to relief under any set of facts consistent with the allegations of the complaint. *Piecknick v. Commonwealth of Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir.1994). In deciding a motion to dismiss under Rule 12(b)(6), the factual allegations in the complaint must be accepted as true and all reasonable inferences that can be drawn therefrom must be viewed in the light most favorable to the plaintiff. *Id.* A court may, however, also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case. *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n. 2 (3d Cir .1994). A motion to dismiss should only be granted if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff bears the burden of persuasion, whereas under 12(b)(6) the defendant bears the burden to demonstrate that no claim has been stated. *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

### III. Discussion

■ "It is well established that individuals have no standing to challenge vi-

**2.** Standing is the determination of whether a specific person is the proper party to bring a particular matter to a federal court for adjudication. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Standing "is founded in concern about the proper, and properly limited, role of the courts in a democratic society." *Id.* A challenge to the standing of a party raises the issue of justiciability and implicates the subject matter jurisdiction of a federal district court. Therefore, a motion to dismiss for want of standing is properly brought under Fed.R.Civ.Pro. 12(b)(1). *Tri-County Concerned Citizens Assoc. v. Carr,* 1998 WL 966019, at *3 (E.D.Pa. Nov.20, 1998); *see also* ERWIN CHEMERINSKY, FEDERAL JURISDICTION §§ 2.1, 2.3 (1994); 13A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE, CIV-

IL2D, § 3531.15, at 95 n. 9 (2d ed.1984). Generally, when ruling on a motion to dismiss pursuant to Fed.R.Civ.Pro. 12(b)(1), "a district court is not limited to the face of the pleadings. Rather, as long as the parties are given an opportunity to contest the existence of federal jurisdiction, the court 'may inquire, by affidavit or otherwise, into the facts as they exist.' " *Armstrong World Indus. ., Inc. v. Adams,* 961 F.2d 405, 410 n. 10 (3d Cir.1992) (quoting *Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947) (citations omitted)). Nevertheless, for purposes of ruling on a motion to dismiss for want of standing, as here, "the trial court ... must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth,* 422 U.S. at 501, 95 S.Ct. 2197.

olations of international treaties in the absence of a protest by the sovereigns involved." *Matta–Ballesteros v. Henman,* 896 F.2d 255, 259 (7th Cir.), *cert. denied,* 498 U.S. 878, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990); *see also United States ex rel. Saroop v. Garcia,* 109 F.3d 165, 167–68 (3d Cir.1997); *United States v. Rodrigues,* 68 F .Supp.2d 178, 181–82 (E.D.N.Y.1999) (because "international treaties are agreements between two or more sovereign states, they normally do not create personal rights enforceable in court by an individual"). This is true " 'even where a treaty provides certain benefits for nationals of a particular state.' " *Matta–Ballesteros,* 896 F.2d at 259 (quoting *United States ex rel. Lujan v. Gengler,* 510 F.2d 62, 67 (2d Cir. 1975)). A treaty may, however, specifically confer upon individuals the right to enforce a provision of a treaty. *Comm. of United States Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 937 (D.D.C.1988). Absent such a provision, individuals do not have standing to assert a claim alleging a breach of a treaty. *United States v. Fort,* 921 F.Supp. 523, 526 (N.D.Ill.1996); *Abi Jaoudi & Azar Trading Corp. v. CIGNA Worldwide Ins. Co.,* 1992 WL 392583, at *2 (E.D.Pa. Dec.16, 1992) (for individual to enforce private right under treaty, treaty must provide for jurisdiction as well as private right and private right must be self-executing, i.e., treaty must prescribe rules by which private right may be determined). The individual plaintiffs do not allege and the Court does not find that the Brown Commitment specifically confers upon the individual plaintiffs the right to enforce its provisions.

The individual plaintiffs, however, characterize the Brown Commitment as a contract and argue that the aforementioned principals are inapposite because their claims are not based upon a treaty. The individual plaintiffs therefore assert that they are merely pursuing their claims as third party beneficiaries to a contract. The distinction that the individual plaintiffs attempt to draw with respect to standing to bring a claim under a contract as opposed to a treaty, however, is a one of semantics and is not legally significant with respect to standing.

█ The Brown Commitment, as well as any "understandings and agreements" thereto, is an agreement between two sovereigns. Although the Brown Commitment is not a treaty as that term is defined in Article II of the Constitution of the United States because it was not concluded by the President with the advice and consent of the Senate, the agreement can nevertheless be understood to be a treaty for purposes of determining standing. "Under principles of international law, the word [treaty] ordinarily refers to an international agreement concluded between sovereigns, regardless of the manner in which the agreement is brought into force." *Weinberger v. Rossi,* 456 U.S. 25, 29, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982). Indeed, a treaty is defined as a contract between independent nations and international law does not distinguish between agreements designated as "treaties" and other agreements. *Id.* & n. 5; *see also* 74 AM.JUR.2D §§ 2 & 4; 87 C.J.S. § 1.

The principals with respect to individual standing under a treaty are in essence the rules governing the standing of third-party beneficiaries of contracts between sovereign nations. Therefore, as an agreement between two sovereigns, the legal principals with respect to standing under international treaties apply to the claims of the individual plaintiffs under the Brown Commitment. *See Z. & F. Assets Realization Corp. v. Hull,* 114 F.2d 464, 472 (D.C.Cir. 1940) (court analogized executive agreement to treaty, holding that agreement between United States and Germany containing mechanism for settling claims of U.S. citizens against another nation does not allow U.S. citizens to litigate the disbursement of payments made to the United States), *aff'd* 311 U.S. 470, 61 S.Ct. 351, 85 L.Ed. 288 (1941). By characterizing

the Brown Commitment as a contract to which the individual plaintiffs are third-party beneficiaries, the individual plaintiffs are patently attempting to make an impermissible end run around the law regarding derivative standing with respect to agreements between sovereign nations.

The issue of standing, therefore, turns on whether the Republic of Korea has formally protested a violation of the rights of the individual plaintiffs under the Brown Commitment. *See Matta–Ballesteros,* 896 F.2d at 259. The United States contends that in order for the individual plaintiffs to have standing, the form of the protest must be "a legal action ... filed by the sovereign." (Defendant's Memorandum in Support of Motion to Dismiss ("Def.Mem.") at 5 n. 4). This contention, however, is unsupported by the case law and lacks merit. None of the principal cases discussing derivative standing suggests that anything more than a formal protest is required. *Matta–Ballesteros,* 896 F.2d at 259; *United States v. Cordero,* 668 F.2d 32, 38 (1st Cir.1981); *United States v. Reed,* 639 F.2d 896, 902 (2d Cir. 1981); *United States v. Valot,* 625 F.2d 308, 310 (9th Cir.1980); *United States ex rel. Lujan v. Gengler,* 510 F.2d 62 (2d Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975).

In *Matta–Ballesteros,* the Court of Appeals held that the petitioner did not have standing to invoke extradition treaties to which the United States and Honduras were parties because the petitioner made no claim that the government of Honduras made an "official protest." 896 F.2d at 259–60. The Court of Appeals determined that protests before the United States' Embassy in Honduras and a bill introduced in the Honduran legislature (which was never voted on) were not an official protest by the Honduran government. There is no suggestion in *Matta–Ballesteros* that in order to protest effectively, the Honduran government was required to file suit. On the contrary, the Court of Appeals suggests that all that is required is

"word from the Honduran government" that it protested the arrest of the petitioner. *Id.* at 260.

Similarly, in *Lujan,* the Court of Appeals affirmed the district court's denial of the petitioner's writ of habeas corpus. 510 F.2d at 66–67. The petitioner had been kidnaped by U.S. agents in Argentina and Bolivia and was brought to the United States on drug charges. The petitioner sought to interpose the violation of the United Nations charter and the charter of the Organization of American States, both of which proscribe the use of force by one state against the territory of another. However, the Court of Appeals determined that the petitioner failed "to allege that either Argentina or Bolivia in any way protested or even objected to his abduction" and that "[t]his omission is fatal to his reliance upon the charters." *Id.* at 67. Again, there is no suggestion that either Argentina or Bolivia would have had to file suit in order to enable the petitioner to rely on the charters. *See id.* On the contrary, it was the failure of either government to object to the abduction that precluded a finding that a violation of international law had occurred. *Id.* Thus, all that is required for an individual plaintiff to have standing to assert their rights under an international treaty is a formal protest by his or her government.

■ The individual plaintiffs argue that they have standing because the Republic of Korea has lodged a formal protest with the United States regarding the payment of disability benefits for Korean veterans who are experiencing health problems due to their exposure to Agent Orange during their tour of duty in Vietnam. To that end, plaintiffs have attached a letter to their amended complaint purportedly from the Embassy of Republic of Korea to the Department of State of the United States bringing to the State Department's attention "the fact that more than 17,000 members of the Korean Vietnam veterans" are suffering from the sequelae of exposure to Agent Orange and the belief of the Korean

Embassy that the Brown Commitment also covers the consequences of Agent Orange.[3] (Amended Complaint at Exh. 2). The letter further states that the Government of Korea would like to resolve the issue under the terms and intent of the Brown Commitment "without delay." (*Id.*). "In this respect, the Government of the Republic of Korea has the honour to propose to hold an experts' meeting of both Governments at an earliest possible date so as to address the compensation issue, and would be grateful for the United States Government's prompt, positive response to this proposal." (*Id.*). The individual plaintiffs assert that this letter serves as a formal protest sufficient to give them standing to seek enforcement of the terms of the Brown Commitment. I disagree.

Far from protesting any action by the United States, the letter merely raises an issue for consideration between the two nations; namely whether the Brown Commitment contemplates payment for disability benefits as a result of injuries caused by Agent Orange. There is nothing to indicate that a dispute exists, i.e., that the United States has refused to pay such benefits or that a refusal to pay such benefits would breach the agreement. On its face, the letter brings an emergent situation to the attention of the State Department with a request that the two nations discuss how the situation should be resolved. Diplomats, and lawyers for that matter, are generally credited with choosing their words carefully. The Court therefore assumes that the letter means what it says and, perhaps more important-

ly, that it does not mean something that it does not say; namely that the Republic of Korea is protesting against some action taken by the United States. Thus, I do not consider the letter attached to the amended complaint to be an official protest by the Korean government such that the individual plaintiffs have standing to bring this lawsuit. (*See* Amended Complaint, Exh. 2).

■ In the alternative, the individual plaintiffs argue that the protest by the Korean government is evidenced by the fact that the Republic of Korea is a named plaintiff in this action. The defendant, however, argues that the individual plaintiffs do not have standing because the Republic of Korea is not actually a party to this lawsuit. Defendant relies upon the affidavit of James G. Hergen, Assistant Legal Adviser for East Asian and Pacific Affairs, Office of the United States Department of State, in which Mr. Hergen states that on July 15, 1999, the U.S. Embassy in Seoul informed him that the Korean Ministries of Foreign Affairs and Justice had officially confirmed that the Republic of Korea is not a party to this lawsuit.[4] (Def.Mem.Exh. 1 at ¶ 20). In so doing, the defendant makes a factual attack on the subject matter jurisdiction of this Court.

The plaintiffs counter by proffering the affidavit of their counsel who asserts that his firm and the firm of his co-counsel were retained in writing by the Republic of Korea to represent it "in pursuing its claim for benefits due under the Brown Memo-

---

**3.** The "letter" is not on letterhead nor is it signed. It does not have a date, a signature line, or any indication that it was sent to the State Department of the United States. There are frankly none of the traditional hallmarks of an official letter that would indicate the authenticity of the letter. Nevertheless, the defendant refers to the document as "[a] formal diplomatic note from the Embassy of the Republic of Korea to the U.S. Department of State." (Def.Mem. at 8 n. 8). Thus, the authenticity of the document does not appear to be disputed by the parties.

**4.** In its opposition to the plaintiffs' motion for extension of time, the defendant cited to Article 41(2) of the Vienna Convention on Diplomatic Relations for the proposition that all official business with foreign countries "shall be conducted with or through the Ministry of Foreign Affairs ... or such other ministry as may be agreed." Although plaintiffs do not dispute this, they argue that it does not answer the question of who is authorized to initiate this lawsuit.

randum." (Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss ("Plt.Mem."), Exh. 1 at ¶ 2). The affidavit further states that the "filing of a civil action' was specifically authorized." (*Id.; see also* Plt.Mem., Exh. 3 (Authorization and Fee Agreement)). In addition, that affidavit states that the retainer agreement was signed by the Premier of the Republic of Korea, "roughly speaking, the number two man in the Korean government." (Plt.Mem., Exh. 2 at ¶ 2).

Through a separate affidavit by Sei Jik Park, a Korean Congressman and Vice-Chairman of the ruling party, plaintiffs assert that "the Korean Premier has the authority pursuant to Article 71 to give instructions to initiate a suit and has so authorized." (Plt.Mem., Exh. 4 at ¶ 6). However, according to the same affidavit, the authority to actually initiate a lawsuit against a foreign sovereign lies with the Korean attorney general. (*Id.* at ¶ 5) ("Based upon my review of the applicable Korean law and regulations, while the attorney general is the one who has [the] power to initiate a suit against [a] foreign sovereign on behalf of the Korean Government, it is unclear as to whether the [P]remier has [the] right to override or set aside the attorney general's action."). In addition, the affidavit of plaintiffs' counsel acknowledges that there is a dispute within the Korean government as to whether this lawsuit should be filed. (*Id.*, Exh. 2 at ¶ 4). Although the Premier and the Korean National Assembly support the filing of this lawsuit, "powerful figures" in the executive branch of the Korean government oppose filing the suit. (*Id.*).

In sum, the individual plaintiffs have failed to allege that the official or organ of the state charged with the authority to bring a lawsuit on behalf of the Republic of Korea has done so. The best plaintiffs offer is that the Premier as given instructions to do so and that, to the knowledge of the plaintiffs, the President has not taken any action to reverse the authorization given by the Premier. Be that as it may, the fact remains that the "one who has [the] power to initiate a suit against [a] foreign sovereign on behalf of the Korean Government" has not done so. (*Id.* at ¶ 5). This is corroborated by the fact that the Korean Ministries of Foreign Affairs and Justice has stated that the government of Korea is not a party to this lawsuit. In addition, the assertion that the Korean legislature may vote on the matter is of no moment because no such vote has been taken and, more importantly, there is no evidence that the legislature can cause the Republic of Korea to be a party in a lawsuit.

The fact that the lawsuit has not been brought by the proper government official is not a mere technicality. Governments, like other large organizations, delegate functions and duties to particular departments and officials as well as the requisite authority to carry out their duties. Moreover, as here, it is not uncommon that there is a dispute between departments or arms of government over how to proceed with a matter. The filing of an action by a sovereign against the United States in a United States District Court is an unusual and serious matter. It is incumbent upon this Court to determine whether the Republic of Korea has properly authorized this lawsuit to be filed. After careful consideration of the arguments and affidavits of the parties, I find that the individual plaintiffs have failed meet their burden of establishing that this lawsuit was properly authorized by the Republic of Korea. Accordingly, I find that the individual plaintiffs do not have standing to enforce provisions of the Brown Commitment.

Defendant also argues in the alternative, however, that the lawsuit is not ripe because the United States has not yet formulated its response to assertion by the Republic of Korea that the injuries of ROK Vietnam veterans due to the exposure to Agent Orange fall within the scope of the Brown Commitment. The letter from the Republic of Korea attached to the amended complaint supports the defendant's con-

tention that the controversy is not ripe for adjudication. The letter broaches the subject (apparently for the first time) and seeks to resolve the issue as quickly as possible. Indeed, there is no allegation that any of individual plaintiffs (or potential class members) have been sought or been denied disability benefits because of the negotiations between the Republic of Korea and the United States regarding the Brown Commitment.

■ Even more fundamental than whether this controversy is ripe for adjudication, however, is whether this controversy presents a nonjusticiable political question. The political question doctrine limits the exercise of federal jurisdiction and forecloses judicial inquiry into the propriety and wisdom of political decisions based on executive discretion. *Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424, 483–84 (D.N.J.1999); *Atlee v. Laird,* 347 F.Supp. 689, 696–97, 700–03 (E.D.Pa.1972) (tracing evolution of political question doctrine), *aff'd,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973). The Supreme Court has identified the features that characterize a case raising a nonjusticiable political question:

> [p]rominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *United States*

*v. Munoz–Flores,* 495 U.S. 385, 389–90, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990). If any one of these identifying characteristics is inextricable from the case, the Court should dismiss the case as nonjusticiable because it involves a political question. *Baker,* 369 U.S. at 217, 82 S.Ct. 691; *Iwanowa,* 67 F.Supp.2d at 485.

Among the questions that have been recognized as posing a nonjusticiable political question, the clearest examples are those cases which involve the propriety of acts done (or not done) in the conduct of foreign relations of our government. *See Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *Z. & F. Assets,* 114 F.2d at 468–69; *Atlee,* 347 F.Supp. at 696–97. Indeed, it is widely recognized that the political branches have broad powers, not subject to judicial scrutiny, in the field of foreign relations. *Atlee,* 347 F.Supp. at 696–97, 700–03 (tracing evolution of political question doctrine generally and noting the "critical distinction between political questions as they relate to purely domestic affairs and those relating to foreign affairs" and "the need for federal courts to move with extreme caution in the sensitive area of foreign policy"). The Supreme Court has warned courts against intruding in matters involving foreign relations, reasoning that:

> [t]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of the political power not subject to judicial intrusion or inquiry.

*Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948). Thus, when the foreign relations of the United States are at stake, courts are properly more hesitant to intervene than when the internal operations of this country are involved. *Atlee*, at 696–97, 701. Nevertheless, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211, 82 S.Ct. 691.

It has long been recognized that the Constitution relegates issues involving foreign policy to the political departments of the government. *Oetjen*, 246 U.S. at 302, 38 S.Ct. 309 ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislature—'the political'—Departments of the Government."). The alleged breach of an international agreement is an issue affecting U.S. relations with another sovereign nation which falls within the domain and competence of the political branches of the government of the United States. *Iwanowa*, 67 F.Supp.2d at 485 (issue of war reparations affects relations with international community and is therefore a political question). Because the power to negotiate and execute treaties and executive agreements between the United States and foreign nations resides exclusively in the political departments of the government, this case presents a nonjusticiable political question. *Z. & F. Assets*, 114 F.2d at 471–72.

■ It is well established that the judiciary cannot order the government of the United States to comply with the terms of an agreement with another sovereign.

"A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress." *Head Money Cases*, 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884); *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 375 (7th Cir.1985); *Canadian Transp. Co. v. United States*, 430 F.Supp. 1168, 1172 (D.D.C.1977), *aff'd in part and rev'd in part,* 663 F.2d 1081, 1092–93 (D.C.Cir.1980) (affirming dismissal of count two as nonjusticiable political question). Indeed, "a federal court has no inherent power to set itself up as the instrumentality for enforcing the provisions of a treaty with a foreign nation if the Government of the United States, as a sovereign power, chooses to disregard it." *Canadian Transp.*, 430 F.Supp. at 1172. Thus, "the courts can give no redress to a person who is injured by a failure of a government to observe the terms of a treaty; such is a political question and one claiming injury must look to his government for relief." *Canadian Transp.*, 430 F.Supp. at 1172; *Hanoch Tel–Oren v. Libyan Arab Republic*, 517 F.Supp. 542, 547 (D.D.C.1981), *aff'd,* 726 F.2d 774 (D.C.Cir. 1984); *see also Goldwater v. Carter*, 444 U.S. 996, 1002–1006, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (authority of President to abrogate treaty is nonjusticiable political question).

■ Other inextricable features of this case indicate that it should be dismissed because it presents a political question. The commitment by Ambassador Brown was made on behalf of the United States to the government of the Republic of Korea and not to the individual Korean veterans. The structure of the agreement was that the Republic of Korea would pay the death or disability gratuity to its veterans and the United States would in turn make a payment to the Republic of Korea. Thus, whether Korean Vietnam veterans suffering from the effects of Agent Orange are entitled to receive disability benefits is a matter to be settled between the veterans and the Korean governmental agency or

department which oversees such matters. It is inappropriate for this Court then to consider the individual plaintiffs' claims for benefits. *Oetjen,* 246 U.S. at 303, 38 S.Ct. 309 ("[e]very sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory"). Particularly relevant here, as the Supreme Court noted, is that permitting "the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly 'imperil the amicable relations between governments and vex the peace of nations.'" *Id.* at 304, 38 S.Ct. 309.

Moreover, because in the past payments under the Brown Commitment were made directly to the Republic of Korea and not to the individual veterans, it is clear that issues between the two nations as to the amount of the payments was intended to be resolved by government to government negotiations. Allowing private litigation over disability claims would express a lack of respect for the executive branch. *See Iwanowa,* 67 F.Supp.2d at 486. Similarly, the resolution of the individual plaintiffs' claims would invariably embarrass and undermine the authority of the executive branch over foreign affairs. *Id.* at 487. Finally, because the relevant material for this inquiry will likely come from a "multitude of sources, including U.S. and foreign sources, which might be voluminous, and, thus, potentially unmanageable for individuals court to handle," this case presents an issue for which the court lacks judicially discoverable and manageable standards. *Iwanowa,* 67 F.Supp.2d at 488–89; *Atlee,* 347 F.Supp. at 702. Thus, in the alternative, the motion of the defendant to dismiss on grounds that this case raises nonjusticiable political questions will be granted

## IV. Conclusion

In sum, I find that the individual plaintiffs have failed to meet their burden in establishing that Republic of Korea properly authorized this lawsuit. Accordingly, I find that the individual plaintiffs do not have standing to bring this suit. I also find, however, that the plaintiffs' claims raise nonjusticiable political questions. Therefore, the motion of the defendant will be granted. An appropriate Order follows.